Argued and submitted June 8, affirmed August 31, 2011

CENTRAL OREGON LANDWATCH,
*Petitioner,*

*v.*

DESCHUTES COUNTY;
Belveron Real Estate Partners, LLC;
Sunriver Resort Limited Partnership;
and Matthew Cyrus,
*Respondents.*

Land Use Board of Appeals
2010075, 2010076; A148199

262 P3d 1153

Paul D. Dewey argued the cause and filed the brief for petitioner.

Laurie E. Craghead argued the cause for respondent Deschutes County, Belveron Real Estate Partners, LLC, and Sunriver Resort Limited Partnership. With her on the joint brief were Liz Fancher and Steven Hultberg.

No appearance for respondent Matthew Cyrus.

Before Brewer, Chief Judge, and Wollheim, Judge.

BREWER, C. J.

## BREWER, C. J.

Petitioner seeks judicial review of a final opinion and order of the Land Use Board of Appeals (LUBA), in which LUBA rejected petitioner's facial challenge to the validity of Deschutes County Ordinance 2010-024 that provides for the remapping of lands that are eligible for the siting of destination resorts. Petitioner argues that the ordinance contravenes the statutory scheme regulating destination resorts because it allows "the mapping of multiple tracts for a single resort and the siting of a resort on a different tract configuration than what was mapped as eligible." Because, as explained below, the ordinance does not violate the governing statutes in the way that petitioner asserts, we affirm.

We review LUBA's order to determine whether, as petitioner asserts, it is unlawful in substance. ORS 197.850(9)(a). As does petitioner, we take the relevant facts and historical backdrop for this case from LUBA's opinion:

"Initially, destination resorts were not allowed on rural lands in Oregon without an 'exception' to the statewide planning goals that limit development on farm or forest land. However, several large resort developments preceded the statewide land use planning system, including Black Butte, Sunriver, and Inn of 7th Mountain/Widgi Creek. In 1981, Governor Atiyeh's Task Force on Land Use Planning recommended that destination resorts be allowed as an economic development tool in rural areas, with certain sideboards to limit their effects and ensure that their main focus would be overnight lodging rather than second home development. The provisions authorizing the siting of destination resorts outside [urban growth boundaries] without taking exceptions to the statewide planning goals were adopted by the Land Conservation and Development Commission (LCDC) in 1984 as amendments to Statewide Planning Goal 8. However, in 1987 the entire content of Goal 8 was added to state law (ORS 197.435-197.465), at the request of destination resort interests.

"* * * * *

"Legislative amendments to the destination resort statutes in 1993 provided that destination resorts are allowed only on land mapped for destination resorts, pursuant to

ORS 197.455. * * * Before 2003, an acknowledged destination resort [map] could be amended only during a state periodic review process. In that year the Legislature added ORS 197.455(2) which provided that counties could remap but not more frequently than once every 30 months.

"* * * * *

"Although counties may regulate destination resorts more strictly than they are regulated by ORS 197.445 and 197.455 and related statutes, counties may not adopt destination resort regulations that would allow the county to approve destination resort proposals that do not comply with the statutes governing mapping of eligible lands for and approval of destination resorts."

(Internal quotation marks omitted; second omission and second brackets in original.)

As pertinent to this case, in 2010, Deschutes County adopted two ordinances. According to LUBA,

"Ordinance 2010-024 amends county comprehensive plan goals and policies concerning destination resorts. Ordinance 2010-025 adopts procedures the county will follow in remapping areas that are eligible for destination resort siting. Neither ordinance adopts any amendments to the county's acknowledged map of lands that are eligible for destination resorts. The ordinances alter the county standards and procedures by which that map may be amended in the future."

Ordinance 2010-024 is embodied in Deschutes County Code (DCC) chapter 23.84, which governs destination resorts. As LUBA explained,

"DCC 23.84.010 describes the county's comprehensive plan requirements for destination resorts. DCC 23.84.020 sets out comprehensive plan 'Goals' for mapping lands that are eligible for destination resorts. DCC 23.84.030 set out comprehensive plan 'Policies' for mapping lands that are eligible for destination resorts. Ordinance 2010-024 amends the DCC 23.84.030 plan policies for mapping lands that are eligible for destination resorts. DCC 23.84.030(3)(a)(6) provides that 'sites less than 160 acres' must be excluded from the county's Destination Resort Eligible Lands Map. Ordinance 2010-024 adopts DCC 23.84.030(3)(d)(6), which provides that destination resorts may be sited in a number of

areas, including 'minimum site of 160 contiguous acres or greater under one or multiple ownerships.' "

(Brackets omitted.)

In this case, petitioner challenges LUBA's conclusion that DCC 23.84.030(3)(d)(6), which, as noted, implemented the remapping process authorized by ORS 197.455(2) and imposed the eligibility requirement of a "[m]inimum site of 160 contiguous acres or greater under one or multiple ownerships," does not violate the governing statutory scheme. Before turning to that challenge and to place our analysis in focus, we set out two provisions of the statutory scheme governing the establishment of destination resorts—*viz.*, ORS 197.455 and ORS 197.445.

ORS 197.455 concerns the first step in the establishment of a destination resort, that is, the identification of land that is eligible for development of destination resorts and the mapping process. It provides:

"(1)  A destination resort may be sited only on lands mapped as eligible for destination resort siting by the affected county. The county may not allow destination resorts approved pursuant to ORS 197.435 to 197.467 to be sited in any of the following areas:

"(a)  Within 24 air miles of an urban growth boundary with an existing population of 100,000 or more unless residential uses are limited to those necessary for the staff and management of the resort.

"(b)(A)  On a site with 50 or more contiguous acres of unique or prime farmland identified and mapped by the United States Natural Resources Conservation Service, or its predecessor agency.

"(B)  On a site within three miles of a high value crop area unless the resort complies with the requirements of ORS 197.445(6) in which case the resort may not be closer to a high value crop area than one-half mile for each 25 units of overnight lodging or fraction thereof.

"(c)  On predominantly Cubic Foot Site Class 1 or 2 forestlands as determined by the State Forestry Department, which are not subject to an approved goal exception.

"(d) In the Columbia River Gorge National Scenic Area as defined by the Columbia River Gorge National Scenic Act, P.L. 99-663.

"(e) In an especially sensitive big game habitat area:

"(A) As determined by the State Department of Fish and Wildlife in July 1984, and in additional especially sensitive big game habitat areas designated by a county in an acknowledged comprehensive plan; or

"(B) If the State Fish and Wildlife Commission amends the 1984 determination with respect to an entire county and the county amends its comprehensive plan to reflect the commission's subsequent determination, as designated in the acknowledged comprehensive plan.

"(f) On a site in which the lands are predominantly classified as being in Fire Regime Condition Class 3, unless the county approves a wildfire protection plan that demonstrates the site can be developed without being at a high overall risk of fire.

"(2) In carrying out subsection (1) of this section, a county shall adopt, as part of its comprehensive plan, a map consisting of eligible lands within the county. The map must be based on reasonably available information and may be amended pursuant to ORS 197.610 to 197.625, but not more frequently than once every 30 months. The county shall develop a process for collecting and processing concurrently all map amendments made within a 30-month planning period. A map adopted pursuant to this section shall be the sole basis for determining whether *tracts*[1] of land are eligible for destination resort siting pursuant to ORS 197.435 to 197.467."

(Emphasis added.)

With regard to the statutory mapping requirements, LUBA explained:

"the map that is required by ORS 197.455 can be created through a process of elimination. The county could start

---

[1] ORS 197.435(7) defines "tract" as

"a lot or parcel or more than one contiguous lot or parcel in a single ownership. A tract may include property that is not included in the proposed site for a destination resort if the property to be excluded is on the boundary of the tract and constitutes less than 30 percent of the total tract."

with a map of the entire county, and by applying the ORS 197.455 mapping criteria, remove six types or categories of land from the map. The county could then deem all lands that remain, following that process of elimination, eligible for destination resort development, subject to the additional statutory criteria that govern approval of individual requests for destination resort approval."

That is so, because

"[l]ands that are shown on a county Destination Resort Eligible Lands Map are simply *eligible* for approval of a destination resort. * * * To complete the process and receive county approval for a destination resort, a proposed destination resort must meet the destination resort approval standards set out at ORS 197.445 and other statutory standards."

(Emphasis in original.)

Unlike ORS 197.455, which concerns the identification of land and the mapping process, ORS 197.445 concerns the second discrete step in the establishment of destination resorts—that is, the approval standards for individual destination resort proposals. That statute provides, in part:

"A destination resort is a self-contained development that provides for visitor-oriented accommodations and developed recreational facilities in a setting with high natural amenities. To qualify as a destination resort under ORS 30.947, 197.435 to 197.467, 215.213, 215.283 and 215.284, a proposed development must meet the following standards:

"(1) The resort must be located on a site of 160 acres or more except within two miles of the ocean shoreline where the site shall be 40 acres or more.

"(2) At least 50 percent of the site must be dedicated to permanent open space, excluding streets and parking areas.

"(3) At least $7 million must be spent on improvements for on-site developed recreational facilities and visitor-oriented accommodations exclusive of costs for land, sewer and water facilities and roads. Not less than one-third of this amount must be spent on developed recreational facilities.

"(4)   Visitor-oriented accommodations including meeting rooms, restaurants with seating for 100 persons and 150 separate rentable units for overnight lodging shall be provided. However, the rentable overnight lodging units may be phased in as follows:

"* * * * *

"(b)   On lands in eastern Oregon, as defined in ORS 321.805:

"(A)   A total of 150 units of overnight lodging must be provided.

"(B)   At least 50 units of overnight lodging must be constructed prior to the closure of sale of individual lots or units.

"* * * * *

"(5)   Commercial uses allowed are limited to types and levels of use necessary to meet the needs of visitors to the development. Industrial uses of any kind are not permitted."

On review, petitioner contends that pursuant to those statutes a destination resort must be sited on a single tract—which requires *single ownership*—and that DCC 23.84.030(3)(d)(6), which provides that destination resorts may be sited in areas including "[m]inimum site of 160 contiguous acres or greater under *one or multiple ownerships*," is inconsistent with that statutory requirement. (Emphasis added.) Petitioner observes that, in all but one instance, namely in ORS 197.455(2), the legislature employed the singular usage, "tract," in referring to locations where a destination resort may be sited. *See, e.g.,* ORS 197.462; ORS 197.467(1), (2).[2] From that pattern of usage, petitioner extrapolates:

---

[2] ORS 197.462 requires that land excluded from a tract must not be used by the resort:

"A portion of a tract that is excluded from the site of a destination resort pursuant to ORS 197.435(7) shall not be used or operated in conjunction with the resort. Subject to this limitation, the use of the excluded property shall be governed by otherwise applicable law."

ORS 197.467(1) addresses the protection of resource sites and refers to a "tract to be used as a destination resort[.]" ORS 197.467(2) concerns conservation easements and refers to "the tract on which the destination resort is sited[.]"

"Throughout the destination resort statutory provisions the text refers to a destination resort being sited on a single tract. * * * The only reference to the plural of 'tracts' is found in ORS 197.455(2) which states that a map will determine 'whether tracts of land are eligible for destination resort siting.' That reference to 'tracts' does not refer to siting a destination resort on multiple tracts, however. It only suggests that more than one tract may be mapped by a county as eligible for potential destination resorts."

According to petitioner, although "tracts (plural) are to be mapped as eligible, a destination resort is to be sited on 'a tract' or 'the tract.' "

As further support for its construction, petitioner argues that the statutory scheme demonstrates that the standards used for mapping land as eligible for a destination resort include several criteria that are dependent on the "contents and configuration of that particular tract of land." For example, petitioner observes that ORS 197.455(1)(b)(A) excludes a site with "50 or more contiguous acres" of unique or prime farmland from eligibility at the mapping stage. According to petitioner, the challenged ordinance would permit—in violation of that prohibition—the combination of prime or unique farmland tracts smaller than 160 acres to reach the minimum size for destination resorts. Similarly, petitioner points out that ORS 197.435(7) allows the siting of a destination resort where there are more than 50 contiguous acres of unique or prime farmland if that farmland is located on the "boundary" of the tract and constitutes "less than 30 percent" of the tract. As petitioner sees things, the combination or reconfiguration of tracts after the mapping stage could result in more than 50 contiguous acres of unique or prime farmland being in the center, not on the boundary, or constituting more than 30 percent of the tract. In petitioner's view, such hypothetical miscarriages of legislative intent demonstrate the soundness of its construction. We disagree.

When reduced to its core, the only issue on review is whether LUBA erred in concluding that DCC 23.84.030(3)(d)(6) did not contravene the statutory scheme by allowing the 160-acre minimum site size criterion that applies to *siting* approval decisions under ORS 197.445(1) to

be satisfied, by multiple ownerships, at least at the *mapping stage* under ORS 197.455.

The short answer to that question is that petitioner has identified no provision in the statutory scheme that the ordinance violates in the asserted respect. ORS 197.455(1) provides that destination resorts must be sited "on lands mapped as eligible for destination resort siting by the affected county." Acknowledged comprehensive plans that allow for destination resort siting must include implementing ordinances which "[m]ap areas where a destination resort described in ORS 197.445(1) to (5) is permitted pursuant to ORS 197.455[.]" ORS 197.465(1). DCC 23.84.030(3)(a)(6) provides that "[s]ites less than 160 acres" may not be included in mapping for destination resorts. It is true that, because DCC 23.84.030(3)(a)(6) does not use the term "tract" in that prohibition, it does not import into the mapping process the "single ownership" restriction for a tract that is contained in ORS 197.435(7). However, that omission is of no consequence. ORS 197.445(1), which contains the 160-acre restriction, refers to sites, not tracts.[3] Because the term "site" is not defined by statute, there is no basis to infer that that term "site" carries with it an implied "single ownership" requirement. Furthermore, in providing that a map adopted under ORS 197.455 "shall be the sole basis for determining whether tracts of land are eligible for destination resort siting pursuant to ORS 197.435 to 197.467," ORS 197.455(2) refers to "tracts" in the plural, not the singular. Nothing in that provision suggests that, at the site approval stage, multiple tracts of land cannot be combined to satisfy the minimum site size requirement of ORS 197.445(1). Likewise, the criteria set out in ORS 197.455(1) do not prohibit mapping lands that might, in the future, be combined to meet the minimum size requirement of ORS 197.445(1). Moreover, nothing in the legislative history of the statutory scheme shows that the legislature intended to restrict the mapping of lands eligible for destination resort siting based on a single-tract premise.

---

[3] It bears emphasis that the 160-acre minimum siting requirement set out in ORS 197.445 is not included in the mapping statute, ORS 197.455. Thus, by requiring that eligible sites for mapping purposes be at least 160 acres in size, the challenged ordinance arguably is more restrictive at the mapping stage than is required by ORS 197.455.

Rather, it is apparent from the text, context, and pertinent legislative history of ORS 197.435(7) that, in defining "tract" in terms of single ownership, the legislature meant to avoid disqualifying a single owner's property from use as a destination resort site if only a portion of the property—located on the boundary and constituting less than 30 percent—is not included in the proposed site.[4]

Finally, the concerns that petitioner raises about possible violations of the exclusions set out in ORS 197.455(1) are not valid. Each of those exclusions, with one exception, applies without regard for lot, parcel, or tract boundaries. So, for example, the 50-acre farmland exclusion in ORS 197.455(1)(b)(A) applies across tract boundaries; thus, an entire 50-acre or greater site that consists of unique or prime farmland must be excluded from a resort map. ORS 197.435(7) merely allows a tract that includes such farmlands to be developed with a resort site elsewhere on the property if the boundary and 30 percent requirements are met.[5]

In sum, we cannot improve on LUBA's conclusion in this case:

"ORS 197.455 imposes no tract minimum size standard for excluding land from the county's Destination Resort Eligible Lands Map. It therefore follows that [DCC] 23.84.030(3)(d)(6), which authorizes including multi-tract 'sites' of 160 acres or more on the county's Destination Resort Eligible Lands Map is not inconsistent with ORS 197.455. Petitioner's textual, contextual and legislative

---

[4] Because petitioner places much emphasis on it, we have given particular attention to the legislative history of ORS 197.435(7), which was enacted in 1993. Or Laws 1993, ch 590, § 1. Petitioner's contrary assertions notwithstanding, we have found nothing in that history that supports petitioner's construction.

[5] The only provision of ORS 197.455(1) that may require the application of a tract analysis during mapping is ORS 197.455(1)(f). That provision prohibits resort development on lands predominantly classified as being in Fire Regime Condition Class 3. Petitioner claims "[t]he statutes would allow two adjoining tracts to be mapped, each with 45 percent of Fire Regime Condition Class 3 lands" and that those two tracts could somehow be combined to create an area predominantly consisting of land in that class. That outcome, however, is mathematically impossible. Once combined, the percentage of land in that class would remain at 45 percent. Accordingly, no statutory violation would occur.

history arguments to the contrary are not persuasive, and we reject them."

Affirmed.